UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. CASE NO: 3:19CR99 (VAB) |
| | : | |
| v. | : | |
| | : | |
| KISHORE BABU AMMISETTI | : | November 22, 2019 |

## MEMORANDUM IN AID OF SENTENCING

To feed his gambling addiction, Mr. Ammisetti engaged in the instant offense. His criminal conduct has harmed the victims, himself, his family, and society as a whole. But, once released, he intends to begin the difficult and painful process of changing himself and making amends to those that he has wronged.

The Guidelines recommend a sentence of 33 to 41 months' imprisonment, but a sentence in that range would be greater than necessary to serve the purposes of sentencing. There is one reason to depart to a sentence of one year and one day: reduced mental capacity based on gambling addiction. There are also four bases to vary to a sentence of one year and one day: reduced mental capacity based on gambling addiction; the unlikelihood of recidivism in Mr. Ammisetti's case; a shorter sentence facilitates restitution; and the principle of incremental punishment. This memorandum addresses these and other arguments after first discussing Mr. Ammisetti's history, characteristics, and offense conduct.

## MR. AMMISETTI'S HISTORY, CHARACTERISTICS, AND OFFENSE CONDUCT

Throughout this memorandum, undersigned counsel refers to Dr. Madelon Baranoski's[1] conclusions, opinions, and evaluation of Mr. Ammisetti. Dr. Baranoski completed Mr. Ammisetti's

1.

---

[1] Madelon Baranoski, Ph.D., is a forensic psychologist and professor of psychiatry at Yale School of Medicine.

psychological evaluation and shared her conclusions with undersigned counsel, but counsel awaits the final written report, which will be filed with the Court when received.

Mr. Ammisetti was born in India, in the southeastern coastal state of Andhra Pradsh on August 11, 1988.  His parents celebrated his birth because they had tried, unsuccessfully, for at least ten years to have children.  Mr. Ammisetti has a sister, Srilatha, who is four years younger.  He was a good older brother and is very close to her.  Certainly an unlikely candidate to end up before the Court, Mr. Ammisetti was a good son, brother, and student who went on to earn his undergraduate degree in biotechnical engineering, and later, his master's degree in Biomedical Modeling and Informatics from Middlesex University in London, England.

In 2013, he came to the United States to pursue a second master's degree at Farleigh Dickinson University in New Jersey; however, he only completed one semester, and after leaving school began working at a liquor store in New Haven.  He worked there until his arrest.

Given his opportunities, academic success, and ambition, Mr. Ammisetti did not reach his potential.  Depression issues contributed to his stunted trajectory, and later, his gambling addiction.  As he informed Dr. Baranoski, his first real experience with a period of depression occurred when he lived in England.  Ironically, Mr. Ammisetti came to the United States, in part to accompany and assist his newly married, less-traveled, younger sister who did not speak English as well as him; however, he had more difficulty adjusting to the United States than she.  As Dr. Baranoski observed, he could not tolerate being alone and he made choices based on what others thought and suggested.

Gambling in India is illegal, but Mr. Ammisetti began betting on sporting events while he lived there.  The more he won, the more he continued to bet.  This was his first experience with gambling.  Mr. Ammisetti was introduced to gambling at the casino in the United States by an

acquaintance, Srikanth Reddy Mummareddy.  Mr. Ammisetti provided Mr. Mummareddy with a ride to the casino, and then remained there with him and gambled.  Mr. Ammisetti won on his first night and described to Dr. Baranoski that he felt an "amazing relief" upon winning; thus began his persistent gambling.  His gambling increased rapidly, and in a matter of a few weeks, he traveled to the casino nearly daily.  He took money from the wine store he managed; from friends asking them to invest; and from his family.  His addiction to gambling was increasing.

The offense conduct began because he learned how to conduct the scheme from Mr. Mummareddy, who had previously stolen money from Mr. Ammisetti and his girlfriend.  Mr. Ammisetti felt desperate at the time he engaged in the offense, and only stopped gambling due to his arrest.  Mr. Ammisetti recognizes that his arrest, while humiliating and frightening, was necessary because it stopped him from gambling and continuing to hurt others through his criminal conduct.  He understands that when released, wherever he ends up living, and it is expected to be in India, he must seek treatment for his addiction otherwise it will never be under control.  He is open to treatment, and, as Dr. Baranoski offers, could be successful with treatment.

And finally, as he has demonstrated by his immediate admission of guilt upon his arrest, and his continued contrition for the havoc he has wreaked on his victims, he accepts full responsibility for his conduct and wants to rectify the harm he has caused.

## DISCUSSION

The principles governing sentencing are well established. "In *United States v. Booker*, the Supreme Court held that the mandatory application of the Sentencing Guidelines was incompatible with the Sixth Amendment." *United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) (citing *United States v. Booker*, 543 U.S. 220, 226–27 (2005)). The Second Circuit then set forth the

model for sentencing in a post-*Booker* world. *See United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), *abrogated on other grounds by United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005). Briefly, there are now three types of sentences. *Id.* at 111 n.9, 113. First, there are within-Guidelines sentences. *Id.* Second, there are above- and below-Guidelines sentences, which are sentences resulting from permissible departures under the Guidelines. *Id.* Third, there are non-Guidelines sentences, which are sentences falling outside the Guidelines range without a permissible basis for departure. *Id.* Before imposing a sentence, "a sentencing judge must consider the factors specified in 18 U.S.C. § 3553(a). . . ." *Fagans*, 406 F.3d at 141 (citing *Crosby*, 397 F.3d at 110–12).

The United States Probation Office has properly calculated an advisory Guidelines range of 33 to 41 months' imprisonment, resulting from Offense Level 20 and Criminal History Category I. Mr. Ammisetti nonetheless seeks a sentence of one year and one day. The memorandum first discusses the following basis for departure: reduced mental capacity, and next addresses four bases for variance: reduced mental capacity, the unlikelihood of recidivism, the principle of incremental punishment, and facilitation of restitution. The memorandum then argues that a sentence of one year and one day is the right sentence in light of all the Section 3553(a) factors.

**I.      Reduced Mental Capacity Is a Basis to Depart to a Sentence of One Year and One Day.**

In *Koon v. United States*, 518 U.S. 81, 94 (1996), the Supreme Court explained that the Sentencing Guidelines apply only to a "heartland" of typical cases. "Atypical cases were not 'adequately taken into consideration,' and factors that may make a case atypical provide potential bases for departure." *Id.* (citations omitted). A district court may depart below the Guidelines

range if it finds "a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0(a)(2)–(3).

The Court should downwardly depart under U.S.S.G. § 5K2.13 because Mr. Ammisetti suffered from a compulsive gambling disorder at the time of the offense and that mental disorder substantially contributed the offense.

The Sentencing Guidelines authorize a departure for "diminished capacity." U.S.S.G. § 5K2.13. Section 5K2.13 provides that a departure may be warranted when: "(1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense."[2] *Id.* Courts have held that "when a person becomes a pathological gambling addict, partly as a result of this pervasive gaming atmosphere, and is driven to crime as a result of his addiction, the court may rely upon this pathology in downwardly departing under the United States Sentencing Guidelines ("U.S.S.G.")." *United States v. Liu*, 267 F. Supp. 2d 371, 372 (E.D.N.Y. 2003).

This Court should adopt the rulings of *Lui* and apply them to the facts of this case. In *Lui*, Judge Weinstein correctly ruled that compulsive gambling constitutes "a significantly reduced mental capacity." The general consensus is that compulsive gambling is a mental disorder. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, § 312.31. And like the defendant in *Lui*, Mr. Ammisetti would not have engaged in criminal conduct but for this disease.

5.

---

[2] A district court may not depart if the defendant's diminished capacity resulted from voluntary drug use; the offense involved actual violence or threats thereof; the defendant's criminal history suggests a need to protect the public; and the conviction resulted from an obscenity or a sex-related offense. U.S.S.G. § 5K2.13. None of these prohibitions are at issue here.

In evaluating Mr. Ammisetti, Dr. Baranoski administered several tests including the Gambling Addiction Assessment that includes scales that address the primary characteristics defined in the DSM-Fifth Edition, which are: impaired function, required action, loss of relationships, employment or assets, and blunted emotion. According the Dr. Baranoski, on the gambling assessment scale, Mr. Ammisetti scored in the positive range with a score that indicated moderate severity. He stopped gambling only because he was arrested. She noted that his responses to the assessment are "diagnostic indicators of the disorder" and included: "I never left the casino with money in my pocket."; "I gambled until I lost everything," (indicates addiction vs. purpose); "I went to the casino after [my girlfriend] was asleep and tried to get back before she got up."; "I lied about what I was doing."; "I told myself I would stop when I left the casino."; "I went without sleep."; "I could not wait until I got back to the casino."; and, "I felt sad and lost several hours after I left the casino – not right away, even if I lost."

Dr. Baranoski articulated the following diagnosis for Mr. Ammisetti:

1)      **Gambling Disorder**.  The Diagnostic and Statistical Manual of Mental Disorders, 5th Edition classifies "gambling disorder" as an addictive disorder and describes the disorder as similar to substance addiction secondary to brain changes:  In addition to the substance-related disorders, this chapter also includes gambling disorders reflecting evidence that gambling behaviors activate reward systems similar to those activated by drug abuse and produce some behavioral symptoms that appear comparable to those produced by the substance use disorders. DSM-5, p. 481.

Dr. Baranoski determined that Mr. Ammisetti met eight of nine criteria for the disorder, showing a severe level of addiction to gambling:

1.      Needs to gamble with increasing amount of money;

6.

      2.      Has made repeated, unsuccessful efforts to control, cutback, or stop gambling;

      3.      Is often preoccupied with gambling, (e.g., having thoughts of how to get money to return to the casino);

      4.      Often gambles when feeling distressed, depressed, guilty, anxious;

      5.      After losing money returns (he continued to gamble until he had no money left);

      6.      Lies to conceal the extent of his gambling;

      7.      Has jeopardized or lost a significant relationship, job, or educational or career opportunity because of gambling; and

      8.      Relies on others to provide money to relieve desperate financial situations caused by gambling.

**2)** **Depression** indicated by sleep difficulty, low energy, tearfulness, feelings of guilt and shame.

Dr. Baranoski determined that Mr. Ammisetti's personality style and defenses contributed as triggers to the appeal of gambling. He was lonely, away from family; he had lost school and his career goal; he was failing and letting his family down. Gambling offered relief and lifted his mood. He did not gamble to win he gambled to gamble, staying until he had no more money. He was addicted and he could not stop on his own.

She further opined that if Mr. Ammisetti did not have a gambling addiction, he would have no criminal record. She reasoned, he never had trouble in school, he is connected to his family, and he had been a successful student. He worked hard and helped others. His personality is one

7.

associated with family connections, cooperation and enduring relationships. During his addiction, all of that changed and gambling became his primary behavior and motivation.

Dr. Baranoski's conclusions support the direct connection between Mr. Ammisetti's gambling disorder/mental capacity, and its effect on his offense conduct. Well-documented research also supports the connection between white collar crime and gambling. *See*, *e.g.*, Spectrum Gaming Group, Gambling in Connecticut: Analyzing the Economic and Social Impacts (2009), http://www.ct.gov/dosr/lib/dosr /june_24_2009_spectrum_final_final_report_to_the_state_of_connecticut.pdf (noting a 400% increase in embezzlement offenses in Connecticut from 1992 (the date of Connecticut's first casino opened) to 2007). In other words, there can be no question that Mr. Ammisetti suffers from a "significantly reduced mental capacity" and that his "significantly reduced mental capacity contributed substantially to the commission of the offense." The Court should therefore depart pursuant to Section 5K2.13.

**II.    There Are Four Bases to Vary Downwardly, (1) Mr. Ammisetti's Mental Capacity Brought on by his Gambling Addiction Contributed Substantially to the Commission of the Offense; (2) the Unlikelihood of Recidivism; (3) the Principles of Incremental Punishment; and, (4) the Facilitation of Restitution.**

The argument discussed above constitutes a basis for a departure as well as a variance because that circumstance bears directly on the Section 3553(a) factors. The Guidelines, however, prohibit departures in some circumstances, even if a fact would be relevant to the factors a district court must consider before imposing a sentence. For example, where, as here, a defendant falls in Criminal History Category I, the district court may not depart on the basis of recidivism. U.S.S.G. § 4A1.3(b)(2)(A). A district court, however, may still impose a non-Guidelines sentence

on this basis. *See United States v. Jones*, 460 F.3d 191, 194 (2d Cir. 2006) ("With the entire Guidelines scheme rendered advisory by the Supreme Court's decision in *Booker*, the Guidelines limitations on the use of factors to permit departures are no more binding on sentencing judges than the calculated Guidelines ranges themselves."). A district court may still impose a non-Guidelines sentence in those cases because a defendant's risk of recidivism bears directly on the need to protect the public from his future crimes.

There are three bases for a downward variance in this case (in addition to the impact of his mental capacity on the offense). First, statistically speaking, Mr. Ammisetti is unlikely to recidivate: he has a lifelong history of employment, graduated from college and obtained a master's degree, and is a first offender. Second, the concept of incremental punishment justifies a non-Guidelines sentence. Third, imposition of a protracted prison sentence will inhibit the payment of restitution. All three arguments are addressed below.

> A. *Statistically speaking, Mr. Ammisetti is unlikely to recidivate: he has a lifelong history of employment, graduated from college and obtained a master's degree, and is a first offender.*

Many courts have relied upon recidivism statistics from the United States Sentencing Commission in deciding to impose a below- or non-Guideline sentence. *See*, *e.g.*, *United States v. Aguilera*, 2008 WL 4830802, at *3 (E.D. Wis. Oct. 28, 2008) (citing U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, (May 2004) [hereinafter, "*Recidivism Report*"]); *United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. 2007) (citing *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score* 15 (Jan. 4, 2005)); *cf. United States v. Payton*, 754 F.3d 375, 379 (6th Cir. 2014) (vacating

and remanding for resentencing because district court imposed above-Guidelines sentence without addressing Sentencing Commission's recidivism statistics on age). Relying on statistical analyses in numerous categories over a fifteen-year period, the Sentencing Commission has found that recidivism rates are strongly correlated with various factors. *See Recidivism Report*. Many factors suggest that Mr. Ammisetti is statistically unlikely to recidivate: he has a lifelong history of employment, earned a bachelor's and a master's degree, and is a first offender.

The Sentencing Commission's statistics show lower levels of recidivism among offenders in Criminal History Category I. *Recidivism Report* at 12. Additionally, employment and education also predict a low likelihood of recidivism, both generally and specifically among offenders in Criminal History Category I. *Id.* at 29 (Ex. 10). Mr. Ammisetti possesses all these attributes. Criminal History Category I offenders with stable employment are less likely to recidivate (12.7%) than similarly situated offenders who were unemployed (20.6%). *Id.* So, too, with college graduates: they are less likely to recidivate (7.1%) than offenders without at high school education (21.3%). *Id.* While Mr. Ammisetti is currently unemployed because he is incarcerated, he has a consistent history of employment and fulltime education, having earned his bachelor's degree and his master's degree.

The most important factor, however, is Mr. Ammisetti's lack of any prior criminal history. His criminal history score does not sufficiently capture why there is little need to protect the public from future crimes. *See Recidivism Report* at 35. "There is a demonstrable difference in the recidivism rates of real first offenders as compared to other defendants in Criminal History Category I." *Germosen*, 473 F. Supp. 2d 221, 227 (citing Michael Edmund O'Neill, *Abraham's*

*Legacy: An Empirical Assessment of (Nearly) First-Time Offenders in the Federal System,* 42 B.C. L.REV. 291 (2001) [hereinafter, "O'Neill, *Abraham's Legacy*"]). Offenders with "no prior convictions or reported contact with the criminal justice system are lumped together in Criminal History Category I with offenders who may be recidivists or who may have prior violent felonies," and the latter category of offenders are more likely to "demonstrate recidivist behavior." O'Neill, *Abraham's Legacy*, 42 B.C. L.REV. at 293–94.

The Sentencing Commission's more recent studies confirm this research. *See* U.S.S.C., *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* (May 2017), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf. Here are the key findings applicable to Mr. Ammisetti:

> There are substantial differences in recidivism rates among groups of offenders in CHC I. Among offenders with zero points and no prior contact with the criminal justice system, there is an 11.7 percentage point difference in rearrest rates. Between offenders with zero criminal history points and some criminal history and one-point offenders there is a 10.4 percentage point difference. Overall, there is a 22.1 percentage point difference in rearrest rates between offenders with no criminal history and one-point offenders. These differences within CHC I are substantially larger than the differences within other CHCs. In addition, offenders with zero points have a longer median time to rearrest and a less serious offense of rearrest than offenders with one criminal history point (public order vs. assault).

*Id.* at 14. Thus, for people with no prior criminal history, "a sentence other than imprisonment is generally appropriate." American Bar Association, *A Report on Behalf of The American Bar Association Task Force on The Reform of Federal Sentencing for Economic Crimes*, available at http://lawprofessors.typepad.com/files/ussc-presentation-9-17-13.pdf.

Additionally, and critically, Dr. Baranoski concluded that Mr. Ammisetti has a number of strengths than can support his recovery and reduce relapse and recidivism:

- Mr. Ammisetti has strong intellectual ability.  He is educated in a field that is growing in importance in medicine and agriculture.

- He is a hard worker and has a strong record of successful employment

- He has a supportive family; his sister is in the United States, and his parents and an extended family are in India.  His family has stayed connected and await his return.  Although he feels shame and embarrassment, his family is eager to have him return to India.

- He is not addicted to substances or alcohol.

- He has never had treatment.  His dependent style will support his engagement and continuation in therapy.

- He is not antisocial.  His criminal activity is connected to his addiction rather than to a pervasive, characterological pattern of rule-breaking and disregard for others.

- Finally, his shame, remorse, and motivation to atone for his behavior are effective internal resources to prevent relapse.

> B.   The concept of incremental punishments justifies a sentence of one year and one day.

The Guidelines also fail to consider incremental punishment. A sentence of 33 to 41 months' imprisonment would be unnecessarily excessive because Mr. Ammisetti has never been incarcerated. In *United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001), the Second Circuit stated:

> Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences . . . for the prior offenses.

*Mishoe* specifically addressed the Career Offender Guidelines, but its concept of incremental punishment applies here. *See United States v. Casteneda*, 191 F. App'x 15, 18 (2d Cir. 2006) (observing that *Mishoe* permits "a departure pursuant to § 4A1.3 . . . 'if the sentencing judge determines, in the exercise of [his] discretion,' that the defendant's criminal history category 'overstates the seriousness of his criminal record.' (emphasis omitted) (quoting *Mishoe*, 241 F.3d at 215)). Where an individual has never been incarcerated prior to his offense, a Guidelines range recommending 33 to 41 months' imprisonment is too severe. *See United States v. Cabrera*, 567 F. Supp. 2d 271 (D. Mass. 2008) (granting 24-month variance, in part, because defendant in drug sting was a first-time offender).

Mr. Ammisetti has been incarcerated for the last 10 months at Wyatt Detention Facility. Time at Wyatt is not "easy" time. For Mr. Ammisetti, a gentle, mild-mannered person, it is particularly difficult because he has been exposed to a level of violence and chaos that he is ill-equipped to handle. Unfortunately, on September 18, 2019, he was the victim of an assault by three other inmates. An investigation by the facility determined that Mr. Ammisetti was by no means at fault. Instead, he was cruelly victimized by the three aggressors who set upon him and hit him about the face. Thankfully, his injuries were not serious, but it was a traumatic event nonetheless.

Given Mr. Ammisetti's lack of criminal record and the impact of these last ten months at Wyatt, there is no reason to believe a Guidelines sentence would be more effective than one year and one day because there is no point of comparison or historical example to disprove the efficacy of a lower sentence.

    C.    Mr. Ammisetti will be better able to pay restitution if sentenced to one year and one day.

Congress requires a sentencing court to consider "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). In cases with outstanding restitution, "the district court's goal of obtaining restitution . . . is better served by a non-incarcerated and employed defendant.'" *United States v. Rangel*, 697 F.3d 795, 803–04 (9th Cir. 2012) (quoting *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (*en banc*)). Sentencing courts thus have imposed non-Guidelines sentences in economic offenses to facilitate the payment of restitution. *See*, *e.g.*, *United States v. Coleman*, 370 F. Supp. 2d 661, 681 (S.D. Ohio 2005) (imposing sentence of probation instead of Guidelines sentence of 6–12 months' imprisonment, in part, because "five years of probation, as opposed to one year of imprisonment or imprisonment with supervised release, will afford Defendants more time to pay restitution"); *United States v. Peterson*, 363 F. Supp. 2d 1060 (E.D. Wisc. 2005) (imposing one day in jail instead of Guidelines sentence of 12–18 months' imprisonment so defendant would not lose his job and could pay restitution).

This Court should likewise vary to a sentence of one year and one day to facilitate the payment of restitution. A longer sentence will, plainly, delay repayment of restitution. Obtaining employment is difficult for anyone with a criminal record, but even more difficult after a protracted sentence that removes the individual from the workforce. *See Stephenson v. United States*, 139 F. Supp. 3d 566, 568 (E.D.N.Y. 2015) ("There is now a great deal of solid evidence establishing that a criminal conviction often is a significant obstacle to employment, in some situations even creating the dire financial circumstances that, in turn, are strongly linked with recidivism").

### III.  A Sentence of One Year and One Day is Right Sentence in Light of All of the Section 3553(a) Factors.

Before imposing any sentence, a district court must consider the factors set forth in 18

U.S.C. § 3553(a).  *See Crosby*, 397 F.3d. at 111 n.9, 113.  Key among those factors are the purposes of sentencing because Section 3553(a) begins with the requirement that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  In *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), the Second Circuit has expanded on this concept and explained that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence.  *See id.* at 142 (observing that where a Guidelines sentence is "in equipoise with [a] below-the-range sentence," parsimony clause requires imposition of the lower sentence).  This determination requires "'generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain.'"  *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (quoting Guido Calabresi, *What Makes a Judge Great: To A. Leon Higginbotham, Jr.*, 142 U. PA. L. REV. 513, 513 (1993)).

A confluence of factors justify a sentence of one year and one day.  These factors have been discussed at length.  Briefly, however, Mr. Ammisetti possesses compelling characteristics: he is a hardworking, intelligent and well-educated individual who, but for a debilitating addiction, would probably never have run afoul of the law.  The offense is undoubtedly serious, but he committed his first criminal offense to feed a pathological gambling addiction. He looks forward to turning his life around and making amends for his offense.

Mr. Ammisetti has been sufficiently punished.  He has served ten months incarcerated, and that time, as discussed herein, has been "hard time" at Wyatt – a facility that is not designed to rehabilitate.  Instead, he has been exposed to, and the victim of, violence.  He has brought shame upon himself and his family, and though he will return to India once released, he will not escape the stigma of his offense as news has spread to his parents' town of his crime.

A more severe sentence would not result in greater deterrence of a first offender. *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28–29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."). And there can be no valid rehabilitative goal in imposing prolonged incarceration. *Compare* 18 U.S.C. § 3553(a)(2)(D) (requiring sentence "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"), *with* 18 U.S.C. § 3582(a) ("[I]mprisonment is not an appropriate means of promoting correction and rehabilitation.").

In light of the facts at issue, a sentence of one year and one day does not ignore the Guidelines or result in unwarranted sentencing disparities. *See* 18 U.S.C. §§ 3553(a)(4)(A)(i), (a)(6). Instead, it gives effect to pertinent policy statements reflecting that the Guidelines inadequately address the unique circumstances at play in this case. *See* 18 U.S.C. § 3553(a)(5)(A). And a departure or variance would be consistent with the approaches of district courts around the county. *See* 18 U.S.C. § 3553(a)(6). Indeed, as other courts have recognized, a sentence of probation gives effect to Congress's directive that first offenders should generally receive a sentence other than imprisonment. *See, e.g., Germosen*, 473 F. Supp. 2d at 227 (observing that Guidelines ignored Congress's directive pursuant to 28 U.S.C. § 944(j) "by redefining 'serious offense' in a way that was entirely inconsistent with prior practice" and "folding first-time offenders into criminal history category I"). In sum, a sentence of one year and one day is no greater than necessary to satisfy the purposes of sentencing.

## CONCLUSION

For the reasons stated above, Mr. Ammisetti respectfully requests a sentence of one year and one day.

Respectfully Submitted,

THE DEFENDANT,
Kishore Babu Ammisetti

FEDERAL DEFENDER OFFICE

/s/ Moira L. Buckley
Assistant Federal Defender
10 Columbus Blvd, 6th FL
Hartford, CT 06106
Phone: (860) 493-6260
Bar No.: ct18803
Email: Moira_Buckley@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 22, 2019, a copy of the foregoing sentencing memorandum and exhibits were filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Moira L. Buckley
Moira L. Buckley